This shows Mr. Ripley, Ms. Ripley, we'll hear from you. Good morning. May I please record? I'm Claremont Ripley with my co-counsel Carol Brook on behalf of the appellant Anthony Vines. This case is about a series of actions that Mr. Vines' former employer, Mountaire Farms, took against him after he made safety complaints. Mr. Vines worked in Mountaire's poultry processing facility, where he experienced several negative medical side effects from dry ice exposure back in 2019. He brought that to Mountaire and to North Carolina OSHA's attention. Mr. Vines will tell anyone that he is very concerned about safety. Safety first. And as it turned out, his complaints were warranted because the CO2 levels from the dry ice were over the legal safe limit. Mr. Vines alleges that after he made those complaints, Mountaire took multiple adverse actions against him and that those actions violated North Carolina's Retaliatory Employment Discrimination Act, or RETA. He also alleges that his termination was a wrongful termination in violation of public policy. Mountaire Move forms granted summary judgment on both claims. But as the moving party, in order for Mountaire to be entitled to summary judgment, they must either establish that there are no genuine issues of disputed fact with respect to Mr. Vines' prima facie RETA case, or they must conclusively establish all elements of the RETA affirmative defense. They failed to do either, which is why we're asking that you reverse. First, with respect to his prima facie case, we believe that Judge Boyle was correct, that Mr. Vines established the elements for the purposes of summary judgment, and Mountaire does not appear to dispute that. So I'm going to go ahead and turn to the affirmative defense. I'm going to ask you about that under RETA. You know, under McDonnell-Douglas, with this burden shifting, we say you can show a prima facie case, and the employer states some reasons, and then the employee can show that those reasons were prefixed and really this was discriminatory, retaliatory. Under RETA, when there's not this burden shifting, you know, where the plaintiff has to be able to prove his case, and then the defendant can prove an affirmative defense, does the first step require more than just a sort of prima facie showing? Does it require evidence that the jury could find in the plaintiff's favor? No, I don't believe so. Certainly not for Mr. Vines as the non-moving party at summary judgment. I guess I'm wondering just, you know, the district court did the back and forth. I'm not entirely sure about whether it seemed like maybe the burden was consistent with RETA, but he still did this back and forth thing where it was at the third step that the district court considered whether Mr. Vines would be able to show that the actions were retaliatory, not just they're close in time. Like, would he actually be able to show, in fact, that that's why they did what they did? Is that part of the, that's part of his initial burden, right? You can't win under the statute unless you can show that, you know, this adverse action happened and it was retaliation. Correct. I mean, Mr. Vines bears the ultimate burden of showing that the actions were retaliatory. The distinction that we think is important between Donald Douglas' pretext framework and what RETA calls for is what the defendant's burden is at the second stage before we get to that third stage. So under the plain language of RETA's affirmative defense, it's a burden of persuasion on the defendant. Yeah, I'm just not sure that there's a third stage, I guess, is my point. The parties do it that way in their brief. And I asked it because you just said there's no dispute that we've established the prima facie case. I'm going to move to the affirmative defense. But Mountain Air, they do have in their brief, they dispute that there's evidence this was retaliatory. They just do it under a, like, third step approach, which, again, it's kind of a procedural question as whether the third step is really part of the first step. I mean, I think in this case where Mr. Vines does have evidence that would allow a jury to conclude it's retaliatory, regardless of where you evaluate it, it should be reaching the jury. That's a fair response that I've tied up on some procedural nitty-gritty that doesn't actually affect the outcome of your case. But, I mean, we are focusing on the procedure here. That is where we think the real error is, that the lower court moved too quickly to evaluating whether this was really retaliation because Mountain Air never presented evidence that either of its purported legitimate reasons for terminating Vines were its real reasons. If you look closely at their summary judgment briefing, they present them as excuses, as these are reasons we could have fired him, but they don't present evidence that those are the reasons they did terminate Mr. Vines. Those two reasons presented are that he had used up all of his leave or that they couldn't accommodate his light duty. Even though this is more of a McDonnell Douglas terminology, why is that pretext? Isn't that your burden to show it's pretext? Well, it's our burden to show it's pretext if we use McDonnell Douglas. If we're just going by the plain language of Rita, it is their... Is there any real difference between that and the point of having the ultimate burden of proof? If the defendant comes forth and has rationales for its actions, what's the district court to do at that point? Doesn't the plaintiff have to then come forward to disprove what the defendant has set out? This might go back and answer your question as well, Judge Rushing. The difference is that Mount Air is the party that moved for summary judgment. If we interpret the Rita defense as an affirmative defense, then as the moving party, they bear the burden of establishing each element of that affirmative defense to be entitled to summary judgment. If they have failed to show, to persuade the court, that either of those were its real reason for terminating Mr. Vines, then summary judgment is not appropriate and this should go to a jury. That is who Mr. Vines should be presenting his facts to to persuade the jury that it was actually retaliatory. Does that answer the question you were asking? I understand what you've said. The other thing that I think is important to look at is that the North Carolina Supreme Court has not used the pretext framework for interpreting Rita. The lower court did use it and Mount Air would like you all to use it, but we don't think it is appropriate. In Ables v. Renfro in 1993, the North Carolina Supreme Court interpreted a very similar statute to Rita, the predecessor. Which was about retaliation for workers' comp complaints. Rita expanded that one a little bit. But in Ables, the court wrote, Defendants suggest that this court adopt the complicated analysis used in federal employment discrimination cases as a model for how retaliatory discharge cases based upon the filing of a workers' comp claim should be developed in our North Carolina courts. We decline to do so. Instead, we rely on the terms of the statute itself to determine what showing is necessary. So we think that that right there is controlling. And that the North Carolina Supreme Court is unlikely to look to McDonnell Douglas instead of the plain language of the statute. So the defendant showed there was quite a bit of absenteeism. And that there was no light duty job that it could give to Mr. Vines. Why isn't that sufficient? Well, Mr. Vines was absent a good bit. And the record shows that the reason for his absence was actually often because of that dry ice exposure and his medical side effects. And then later because of his back injury that he sustained at work on March 11th. But the defendant does not actually argue that it's affirmative defense or it's purported legitimate reason for terminating Vines was his absenteeism. They actually say the opposite. I just wrote down the site. I think it's page 1107 in the record is where they say that's not the reason they fired him. So he did not have a duty either for using what I say is the proper RETA framework or under McDonnell Douglas to disprove that. Because Mount Air never claimed it was because of his absences. Ms. Ripley? Yes. Ms. Ripley, what about their claim that they did not have available light duty jobs? That seems to have gone unanswered in this litigation. Why wouldn't that be enough? I believe we did respond to that in our brief and actually directed the court to the testimony of Mount Air's corporate designee, Ms. Webster. Where she explained we don't call it light duty. We call it restricted duty. But we do have restricted duty jobs. And they offer the restricted duty jobs. You said that was reserved for workers' complex. For people with a workplace. I'm sorry, you two spoke at the same time. Can you repeat yourself, Judge Keenan? No, that's okay. Go ahead. Please answer. Mr. Vines needed the light duty because of the back injury that he got on March 11th on the job. Mount Air did not send him to their occupational health clinic, which is where the workers' comp process has started. So the workers' comp process was never triggered in this case because he didn't know about his workers' comp rights. But that does not mean that he shouldn't have been given light duty. Ms. Webster testified that he should have been. Ms. Webster said they didn't have any light duty. But they were parsing words there, I believe, Your Honor. They said we have restricted duty. We don't call it light duty. And Mr. Vines also testified that there were a handful of jobs he had done that he could do that he considered light duty. Including the permanent grader position where you just stand on the poultry processing line and the chicken passes you by and you're doing quality control. And that dry ice packing position. All he wanted was proper safety equipment so he could do that. He said that was light duty. He needed light duty because of his neuropathy, right? Not because of the back injury? No, Your Honor. The neuropathy he had all along. He did not need the light duty until after that back injury on March 11th. So he was capable of doing the job that he had been relocated to. That job wasn't too difficult for him because he didn't need a special light duty job because of the neuropathy. So this isn't really in the record. I'm not sure quite how to answer it. Don't go asking for the record. But what is in the record is that Malnair believed he needed an easier job, a light duty job, because of his neuropathy. And they put that in a memo. We should put him on a permanent grader position because he needs a light duty job. And instead, they put him on a different job on March 11th, which was not light duty, which was picking up boxes of chicken quarters and moving them somewhere else. And that is where he injured his back. Can you take the rest of your time here to address this alternate ruling of the district court on the suspension claim that it was without jurisdiction? Because I don't think you addressed that at all. We're talking about the footnote that if we're left with just suspension, then the court doesn't have jurisdiction. You're right. We did not directly address that in our briefing because we believe that Malnair is not entitled to its affirmative defense on the terminations either. If you were to only reverse with respect to the first three adverse actions, the disciplinary warning, the suspension, and the retaliatory relocation. We affirm on the suspension is left. I don't think you've challenged any of the factual conclusions that the district court made in that regard. Well, with regard to the suspension, there's ample evidence in the record that he was, in fact, suspended. Ms. Ripley, I think, though, that when you're answering the question, it would be helpful for us to know how the two-day suspension could meet the diversity threshold of $75,000. I'm not sure if it would, Your Honor. We haven't calculated damages independently just based on that suspension because we believe there's evidence to support all of the retaliatory actions, including the termination. But if we were left with just the suspension, then there might not be diversity. We initiated this action in state court. It was defendants who removed it. I mean, I guess we would be left going back to state court, which would be unfortunate because Mr. Vines initiated this action back in 2019 as a pro se in the administrative process. I'm well over my time, but I'm happy to keep answering questions. You've got some rebuttal time. Okay. Ms. Dorminey. Thank you, Your Honor. May it please the court, my name is Betsy Dorminey, and I'm appearing today on behalf of Mount Air Farms. First of all, I know I need hardly remind this panel that you have the power to affirm a district court's decision for any reason that is supported in the record. It doesn't have to be because of the particular analysis that the judge below gave. Although I do have to say, at least ending here as appellant, certainly, that I think Judge Boyle is absolutely right in this case. I disagree with my learned counsel on the question of whether we concede that Vines made out his prima facie case of discrimination. I do not think so, but I'm an advocate, and when I wrote my motion for summary judgment, I said he didn't. But Judge Boyle, applying Rule 56 the way he's supposed to, found that he did, and he spotted them, the suspension. I don't think that most large poultry plants will suspend people with three words of see you Monday, particularly following a meeting in which they have erased a number of his unexcused absences in order to allow him to continue to work. And this is a little bit indirect, but jumping all the way to the greater weight argument that I believe counsel is making. First of all, I think you're correct, Judge, in saying that they're trying to somehow bypass this third step of ultimate burden of proof in McDonnell-Douglas. By making it to the employer's duty to persuade immediately, no, no, no, we did this for a legitimate reason, and moreover, we're right. So are we applying McDonnell-Douglas here, or are we applying a North Carolina-specific? Well, that's a very good question, Your Honor, and the judge is. We're hoping you got a very good answer. Well, I think because the North Carolina Courts of Appeals apply the McDonnell-Douglas burden-shifting standard in RETA cases. I have a very recent decision from 2023, Sloan v. Moxville, and the district courts certainly apply it. And there's a decision two weeks ago, Malik v. Amazon, and I can provide sites to those for you if you wish. Is there a substantive difference between the two? No, I don't think so, Your Honor, because McDonnell-Douglas is, it's really more of an analytical tool that the Supreme Court has devised and has been widely used all over the country to deal with this flood of discrimination and retaliation lawsuits that have come in from the employment area into the federal courts. It's an analytical tool because it helps allocate the relative burdens of proof, and it should be the plaintiff who has the ultimate burden of proof on a retaliation or discrimination suit because this is not something that you win by default if the other party can't prove it. But moving to that, I think we do have, in spades, the greater weight of the evidence here that we were trying to keep Mr. Vines employed and not get rid of him. First of all, the discussion about March 11, he worked one day after five weeks of absence and claimed that his back hurt and that he came back a few days later with a doctor's excuse. It is not supported in the record at all that the job that he was assigned to when he returned for that March 11 day was involved heavy lifting. He does not say that in the pages that are cited in the appellate's brief. Leg quarters are the little things you get from Kentucky Fried Chicken. It's the thigh and the drumstick. It's not a burdensome job. He does say in his deposition that he had to pick up something heavy. There's not a description of exactly how it works, but you can't dispute that he says that in his deposition. I was a little confused about the relocation because it seemed like there's this early March memo, a March 7 memo saying he's going to be moved to a greater position, but then I guess he didn't come back to work until Monday. Instead of greater, it was the leg quarters position. There seems to be a little confusion in the arguments about where he was relocated to. Can you help me sort that out? Well, yes, and I think that comes down to the poultry industry and the way these lines work. People are moved around to different positions based on what positions need to be filled on a given day. And not everybody works the same job, and we don't certainly have, you know, entitlements or specific bidding for specific positions on a line where everyone is working together in a process to produce, you know, to go from birds to the freezer. So it may have been that the position that he was given to try that one day he returned was not the permanent greater position, but it's entirely possible that the greater position was already filled and they didn't want to dislodge somebody else to move him into it. Now, they did try to work very hard with him to get what he needed, and he talks about needing particular respiratory things. If you look in the OSHA, well, I think it is in the record, actually. OSHA prescribes a mask and gloves for people who work with dry ice, and he was given those things. But to return to the greater weight, which I think really does matter here because that's what it comes down to at the end of the day, he failed to disclose his neuropathy when he was hired. The reason they have these medical questionnaires is to find out what kind of jobs people can do and how to utilize them best so that they can be successful. They didn't discipline or discharge him for that. They tried to find him a new position that he could work. It was the dry ice one. It didn't work out. He tried, you know, he had absences that he accrued, he said, because he was ill. They had been reported initially as unexcused absences. He had this meeting with the upper management in the conference room to talk about what was going on and how they could make things work better. They erased some of his absences, took him at his word that they should have been excused and not unexcused. Do you agree that he wasn't terminated for violating the attendance policy? No, I do not. I think he was. I mean, Judge Boyle is interesting in his decision. We certainly argued that that was the reason for his termination, with absenteeism and exhaustion of leave. It's hard to parse these two different kinds of absences because they both, at the end of the day, end up to somebody not being there to work. Now, Mount Air never said no to him for a single request. So was that a stated reason when he was terminated? The company told him one of the reasons was because he violated the attendance policy. Well, he'd also exhausted leave. Did they tell him that he was fired for violating the attendance policy? I don't know if it was specifically the attendance policy, but exhausting your leave is a component of attendance because, again, they all boil down to whether you're there or not to do the job. I thought part of it was that they didn't have jobs for him. They didn't have the light-duty jobs. Well, no, you're correct about that. That was an additional reason, and Judge Boyle did address that as well. Excuse me, Ms. Stoney, Mount Air gave different reasons and different dates for ending the employment, did it not? And how do we factor that in? I don't think they gave different reasons as much as they had multiple reasons for terminating his employment. The very last day after March 11, when he came in and he requested light duty, which was not available, again, they have restricted duty for people with workers' compensation, who are on workers' compensation, and that's not light duty. There is a distinction between those two things. But when he came in that day, they were going to initially grant him an additional period of leave because he said his back hurt, and so the benefits supervisor went to look to see whether he would be eligible for additional leave for that purpose, and that was when they discovered that he had exhausted the 240 hours of personal leave that they allow employees who are in their first year of work, as was Mr. Vines, and are not eligible for FMLA-type leave. So, you know, at the end of the day, Mr. Vines worked 4.65 hours for every one hour he took of leave, and then, and this isn't in the decision, but it is in the record, he was marked eligible for reemployment at the end, and I submit that these are not the actions of an employer bent on retaliation. They could have terminated him for not disclosing a medical condition when he was hired. They could have terminated him for excessive absences early on when he exceeded the limit. They could have terminated him for exhaustion of leave later, and they could have said, sorry, we don't have light duty for you here, and they could have said, don't come back and bother us again, but they didn't do any of those things. They granted his every request for leave. They noted that he would be eligible for reemployment if he cared to come back and apply, and I think that is very much the greater weight of the evidence, that there was no discriminatory or retaliatory motive, and at the end of the day, it is the plaintiff's burden to prove that to the court rather than just say, well, it's a default situation, and I said they retaliated against me, and they didn't sufficiently explain that they didn't, so I win. Okay. Does the record show who made the decision to relocate him on March 11th? I don't believe that it does because these decisions are often made on the floor as opposed to in the HR room, deciding who's going to do what position on a particular day. You know, the jobs in the poultry plant are all fairly difficult, but, you know, sometimes people move around, and he tried this new position for exactly one day and then didn't come back, and that was after he had been out of work for five weeks, and understandably it's going to be a bit of an adjustment when you come back to work after being out that long and have to be in a new environment again. Judge Boyle, I think, did an excellent job in his decision. He resolved all doubts that, you know, all disputed facts in favor of the plaintiff as he was supposed to. I disagreed with some of that, as I said before, but, you know, in the end of the day, he did come to the conclusion, and I think he's absolutely correct, that when clients who indisputably had a lot of absences, he was found to have exceeded, you know, engaged in an excessive absenteeism, and when it was determined that he had exhausted all of the leave that the company generously allows its employees, even when they're not entitled to any leave, that those were bona fide reasons for the decision to terminate his employment, and even then they were willing to have him back. So talk to us for just a minute about the alternate basis for dismissal on suspension claim, lack of jurisdiction. Your Honor, I have to say I'm not all that familiar with that aspect of it. Okay. I do think that the, you know, I wouldn't concede that he's made a prima facie case, but Judge Boyle spotted him for it, and I think that was the right thing to do under the circumstances. So what else do you have for us today? I'm willing to answer any more questions, although I would, your comment does make me think about the line from the, I think it was the Supreme Court, I can't remember the exact case, but where the judge said that we don't, federal courts aren't asked to consider super personnel departments and make, you know, second-guess the decisions that are made by every HR department. The ones here I think were utterly defensible, and certainly I think Mount Air bent over backwards to try to keep Mr. Vines employed, and again indicated that they would have him back. So these are not, you know, at the end of the day, it's the plaintiff's burden to prove that we discriminated or retaliated against him, and I just don't think they can do it. All right. Thank you very much, Ms. Dormier. Ms. Ripley, you've got some rebuttal time. Thank you, Your Honor. I think above all else, Ms. Dormier's argument about the facts has demonstrated that there are a lot of genuine disputed facts in this case, making it not appropriate for summary judgment. It's also confusing the facts a little bit. I'd like to clarify on the retaliatory reassignment, which we allege was what happened on March 11th. If you look at both Mr. Vines' deposition testimony, but also his supervisor, Ms. Campbell, this JA576 is the part of her depo I wrote down, but she explains that he was assigned to a permanent grader position prior to March 11th. The March 11th position was not the permanent grader position. There was disagreement between the parties about whether Mr. Vines' meeting with upper management that Ms. Dormier explained occurred on February 25th, as Mr. Vines and Ms. Campbell allege, or occurred on March 6th. What's the evidence that going to that last position was in some way retaliatory? The memo that Ms. Richardson wrote on March 7th that says Mr. Vines should be assigned to a permanent grader position to accommodate his neuropathy. And it's, yes, I am arguing that... How does that prove your case? I think it proves that they knew Mr. Vines had some medical issues and needed an easier position. He is an older man. It's in the record, too, he calls himself slow, an older man. And because of that, they were thinking, let's just put him on an easier position, a permanent. The memo says disclosure of issues with his feet due to neuropathy. He'll no longer be allowed to work in the tower. He'll be assigned a permanent grader. Correct. So that's what you're relying on is the issues with his feet due to neuropathy. It's what they thought. As evidence of their knowledge that he needed an easier position instead of this leg quarters position. The other thing is Ms. Dormier just gave you all an explanation for why he was moved. Why does that amount? He has a day where he's not in this permanent grader, but he's still... How does that amount to retaliation? So he was moved out of the department he'd been in, tenders. His supervisor, Ms. Campbell, was not given any explanation for that. Malnair has not given any explanation for that except for the one Ms. Dormier just gave. In her deposition, Ms. Campbell says, I think he had complained about working with me and so he was moved out of my department. Yes, you are correct. I do believe Ms. Campbell said that in her deposition. I haven't seen that in Malnair's explanation for the relocation now. I think there is enough evidence there for a jury to decide why they moved him. I think they could easily conclude they wanted to get rid of him. They wanted him somewhere else. All you've got is he worked this job this day, he worked this job another day. I'm just not seeing how you're connecting the dots that that move is a retaliatory act. Well, there's the temporal connection too. I mean, OSHA inspected March 5th. March 6th is when he was suspended. He was out Thursday, Friday, March 7th and 8th. His first day back was March 11th. So there is a clear temporal proximity to the OSHA inspection. He was still on dry ice then, right? Correct. They moved him off of dry ice back on February 25th. I wanted to go back to the Court of Appeals decisions and McDonnell Douglas. Because I believe Ms. Dorminey has misrepresented how widespread the use of McDonnell Douglas is. The case that kind of started it in the Courts of Appeals was FATA, the M&M Properties, in 2012. And it cites to Lilly V. Mastic, which is a 2004 Middle District of North Carolina case, for the proposition that they can use McDonnell Douglas. And what Lilly had said was, The North Carolina courts have held that plaintiffs may generally rely on the evidentiary standards employed in federal discrimination cases to establish RETA. Lilly cited to another case called Wiley v. UPS. There's two Wiley v. UPSs here. This is the Middle District of North Carolina one from 1999. And what that case said is that the North Carolina Supreme Court has recognized federal decisions can offer guidance in establishing evidentiary standards. Citing to Ables v. Renfro, which is the case I told you all earlier, the North Carolina Supreme Court case from the 90s, that specifically declined to use McDonnell Douglas. So FATA has been, the 2012 North Carolina Court of Appeals has been cited multiple times, including some of the recent decisions that Ms. Dorminey referred to, several of which are unpublished, for this proposition that we use McDonnell Douglas for RETA. But if you trace FATA back to Lilly, to Wiley, to Ables, you see there was a mistake at the origin. And Ables has been, I think, miscited for this proposition when it actually specifically declined to use McDonnell Douglas. But again, even if we are using McDonnell Douglas, even if Mr. Vines has to show that we're reaching that third step on pretext, what his burden is is to present evidence that rises above speculation that the stated reasons from Mount Air weren't their real reasons, that it was actually due to his protected activity. If he offers circumstantial evidence to discredit those proffered nondiscriminatory reasons, it should be decided by a trier of fact. Actually, I think Ms. Dorminey highlighted several of the disputed issues when she was telling you the various reasons he might have been terminated. They have changed their reasons for terminating him over and over again in the paperwork, including revising their termination record from April 17th, which said he was terminated for attendance or tardiness, or it was a voluntary medical resignation, and revising that exact document on May 3rd to say that it was because he didn't return from leave. None of those are the reasons that they argued in their briefing as their legitimate reasons or their affirmative defense for terminating him. This court has acknowledged that constantly changing reasons for termination can be evidence of pretext. It is also acknowledged in CalGIL, I don't have the full site in front of me right now, but that if the plaintiff can point to facts that it believed would allow the trier of fact to conclude that the employer was simply looking for an excuse to get rid of him, that that can be evidence of pretext as well. And we think that Mr. Vines has pointed to ample facts to support that kind of conclusion as well. I see I'm out of time. Do you have any more questions? Thank you very much. We appreciate the argument of both counsel. I ask the clerk to adjourn court sine die. We'll come down and greet counsel, and then once the courtroom is cleared, we'll reconvene. This honorable court stands adjourned sine die. God save the United States and this honorable court.
judges: G. Steven Agee, Allison J. Rushing, Barbara Milano Keenan